IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Marcus E. Wells (M06904), | ) |
| Plaintiff, | ) |
| v. | ) Case No. 23 C 2084 |
| | ) Hon. Thomas M. Durkin |
| Hejaz, et al., | ) |
| Defendants. | ) |

### MEMORANDUM OPINION AND ORDER

Plaintiff Marcus E. Wells, who is currently an Illinois prisoner, brought this *pro se* civil rights action under 42 U.S.C. § 1983 against Cook County Sheriff's Officers Hejaz and Davis and Sergeant Pederson ("Defendants"), claiming that they used excessive force against him to dispel a disturbance when Plaintiff was previously a detainee at the Cook County Department of Corrections ("CCDOC") in January 2023. Before the court are the parties' cross-motions for summary judgment. For the reasons discussed below, Plaintiff's motion for summary judgment is denied and Defendants' motion for summary judgment is granted.

**I.    Background**

The following facts are taken from the parties' Local Rule 56.1 submissions, including video recordings of the incident in question.

On January 7, 2023, the date of the incident underlying this lawsuit, Plaintiff was a pretrial detainee housed in Division 9 at the CCDOC, and Defendants were employees of the Cook County Sheriff's Office. On that date, according to Plaintiff, he refused to lockup in his cell for the night and told an officer that he felt both suicidal and homicidal and wanted to speak to a psychologist. Instead, the officer called a "refusal team". The refusal team's encounter with Plaintiff was recorded and preserved by CCDOC, and both parties rely upon the footage in support of their

summary judgment motion. The footage consists of two videos – one of an overhead view of Plaintiff's gallery and the other from the body-warn camera of one of the officers on the refusal team. They together show the following.

As the refusal team, consisting of Defendants and approximately 12 other officers, entered Plaintiff's gallery from the ground floor, Plaintiff descended the stairs from the upper tier. He shouted to the officers as he walked down the stairs that he was homicidal and suicidal; he repeatedly stated that he would not lock up, and that he would kill his cellmate and kill himself if he had to return to his cell. He then said that he was "going through a lot of shit" and twice repeated that, "I can't live no more".

In response, Sgt. Pederson ordered Plaintiff to be handcuffed, and Officer Hejaz placed one cuff from his set of handcuffs on Plaintiff's right wrist. At this point, Sgt. Pederson stated that Plaintiff was "going to the hole" (meaning segregation). Plaintiff verbally balked at the notion and then, as he admits, snatched his left arm away and swung it around, refusing to be handcuffed. Plaintiff then struggled and fought against several of the officers who quickly swarmed Plaintiff and attempted to maneuver each of his arms to handcuff him. Officers ordered Plaintiff to "stop" four times, but Plaintiff continued to struggle and resist.

At this point, Sgt. Pederson tazed Plaintiff in the back, and the numerous officers then attempted to take Plaintiff down to the ground and handcuff him behind his back. As multiple officers attempted to bring each of Plaintiff's arms around his body and take him to the ground, Plaintiff resisted by refusing to bring either of his arms behind his back and also refusing to lower himself to the ground. At one point Plaintiff attempted to grip a nearby table to avoid being handcuffed or lowered to the ground. At this time, while the refusal team was attempting to bring

Plaintiff to the ground, Officer Davis ran around from behind Plaintiff so that he was then in front of and facing Plaintiff. Officer Davis punched Plaintiff several times around the head. At this same point in the struggle, Officer Hejaz was behind Plaintiff and punched him several times in the back and shoulder area from behind.

The officers were then able to get Plaintiff face down onto the ground. At this point, Plaintiff's body is largely obscured by the officers' bodies above him. However, the footage shows that the officers bodies' visibly struggling to continue to handcuff Plaintiff, who was screaming erratically. While the officer struggled to handcuff a prone Plaintiff, one officer yelled three times for Plaintiff to stop or else he will be tased. Another officer yelled for Plaintiff to give them his arm. Another officer yelled for Plaintiff to put his hand out and put his hands behind his back. During this part of the struggle when Plaintiff was on the ground, Officer Hejaz again punched Plaintiff several times in the back and shoulder area, and Officer Davis again punched Plaintiff around the head. Sgt. Pederson also tazed Plaintiff again.

Approximately one minute after Plaintiff first snatched his left hand away, the refusal team was finally able to secure Plaintiff in handcuffs behind his back. Once the cuffs were secured, Plaintiff was subdued and the use of force ceased. The officers did not use any further force against Plaintiff. As the officers helped Plaintiff up and escorted him out of the gallery, Plaintiff stated, "thank you for the lawsuit" and "thank you" several times. He also stated, "I needed that" twice, and then, "I appreciate y'all." According to Plaintiff, he made these statements because he was having a manic episode.

As they left the gallery, a few of Plaintiff's dreadlocks and a small amount of blood around them are visible on the ground. The recording does not show how Plaintiff lost these dreadlocks,

3

but Plaintiff says that at some point Officer Davis pulled them out. Plaintiff was escorted to a chair in the waiting room of the healthcare unit, and video recording concluded.

Plaintiff presented to the healthcare unit in stable condition. He sustained two lacerations to his right eye and received five stitches. He never lost consciousness. He did not present with blurred vision or dizziness. And he did not experience any nausea or vomiting. Officers Davis and Hejaz had swollen hands, and Officer Hejaz had scrapes and blood on his hand and elbow.

Plaintiff brought this lawsuit in April 2023 under 42 U.S.C. § 1983, and after screening his complaint in May 2023 under 28 U.S.C. § 1915A, the Court allowed Plaintiff to proceed on an excessive force claim against Defendants (Dkt. 4).

**II.     Summary Judgment Standard**

Both Plaintiff and Defendants move for summary judgment on Plaintiff's excessive force claim. To be exact, both parties submitted documents titled motions for summary judgment. Plaintiff's documents at times appear to be a response to Defendants' motion but, because the documents were submitted as a motion and because Plaintiff requests judgment in his favor, the Court will analyze the parties' submissions as cross-motions for summary judgment.

On cross-motions for summary judgment, each movant must satisfy the requirements of Federal Rule of Civil Procedure 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Rule 56 permits summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no

genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment also must support his factual assertions with citations to record evidence or otherwise demonstrate that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1).

After a properly supported motion for summary judgment is made, the opposing party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (internal quotation marks omitted). That is, the nonmoving party must go beyond the pleadings and "identify with reasonable particularity the evidence upon which [he] relies." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). "[B]are allegations not supported by specific facts are insufficient in opposing a motion for summary judgment." *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1036 (2003).

Because the court is considering cross-motions for summary judgment, it ordinarily would view the facts in the light most favorable to Plaintiff when considering Defendants' motion and in the light most favorable to Defendants when considering Plaintiff's motion. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) (explaining that, on cross-motions for summary judgment, the court views the record and all inferences in favor of the party against whom the motion under consideration is made). But where, as here, the events in question were preserved in a video recording, the court need not adopt the non-movant's version of events, but instead must view the facts "in the light depicted by the videotape," provided that "[t]here are no allegations or indications that th[e] videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." *Jones v. Anderson*, 116 F.4th

669, 677 (7th Cir. 2024) (quoting *Scott v. Harris*, 550 U.S. 372, 378, 381 (2007)). In *Scott*, the Supreme Court found that a video showing the plaintiff driving erratically during a high-speed chase provided irrefutable evidence that the plaintiff posed an imminent threat to others. *Id.* at 379–80, 384. The lower court, therefore, should have viewed the facts in the light depicted by the videotape. *Id.* at 381.

***Following this precedent, this Court will view the facts related to Plaintiff's encounter with Defendants and the rest of the refusal team in the light depicted by the video evidence, to the extent such evidence exists.*** See *Lopez v. Sheriff of Cook Cty.*, 993 F.3d 981, 984 (7th Cir. 2021) (court may "take stock of what the video evidence shows without favoring [the non-movant] where the video contradicts his view of the facts"); *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) ("When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage.").

Summary judgment is appropriate if, on the evidence provided, no reasonable juror could return a verdict in favor of the non-movant. *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772-73 (7th Cir. 2012); *see Anderson*, 477 U.S. at 251-52.

**III.     Analysis**

The only issue presented by this litigation is whether Defendants' use of force was excessive in light of the events of January 7, 2023.

Because Plaintiff was a pretrial detainee at the relevant time, his claim arises under the Fourteenth Amendment's Due Process Clause. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015). Under the Fourteenth Amendment, an officer's use of force is excessive if it amounts to punishment. *Id.* at 397. This includes actions undertaken "with an 'expressed intent to punish,'"

and those which are "not 'rationally related to a legitimate nonpunitive governmental purpose,'" or "'appear excessive in relation to that purpose'" when viewed objectively. *Id*. at 398 (quoting *Bell v. Wolfish,* 441 U.S. 520, 538, 561 (1979)).

To prevail on an excessive force claim, a pretrial detainee must show that the force purposely or knowingly used against him was objectively unreasonable. *Id.* at 396–97. Whether the force was objectively reasonable depends on the facts and circumstances of each case. *Id.* at 397. Factors to be considered include: (1) the relationship between the need for use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officers to temper the amount of force used; (4) the severity of the security problem at issue; (5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id.* at 397. The court considers these factors from the perspective of what a reasonable officer on the scene would have understood, not with the benefit of hindsight. *Id.* The court also must take into consideration the government's need to manage the facility in which the plaintiff was detained, and defer to policies and practices that are "needed to preserve internal order and discipline and maintain institutional security." *Id.* (cleaned up).

The Seventh Circuit has repeatedly emphasized that "[w]hether a particular use of force was objectively reasonable is a legal determination rather than a pure question of fact for the jury to decide." *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018); *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013) (same); *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009) (same). Thus, summary judgment is proper in an excessive force case when there is no genuine issue of material fact between the parties, or where Plaintiff's version of events is accepted as true,

and no reasonable jury could find that that particular use of force was excessive. *See, e.g., Catlin*, 574 F.3d at 367; *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016).

Defendants argue that they used only objectively reasonable force, pointing to the undisputed facts that Plaintiff refused to return to his cell, and then resisted the refusal team's attempts to handcuff him throughout their encounter. They also point out that it is undisputed that they discontinued the use of any force once Plaintiff was handcuffed. (Dkt. 60, pg. 4-8.)

Plaintiff does not dispute that he snatched his arm away and refused to be handcuffed when threatened with segregation time, but he contends that once he was on the ground the refusal team had immobilized him such that Defendants' action in punching and repeatedly tasing him at that point were gratuitous. He also points to his injuries as evidence of excessive force. (Dkt. 68, pg. 2-10.)

Defendants have the better of the argument. As they contend, most of the *Kingsley* factors weigh in their favor to employ the level of force that they did based on the undisputed factual record and the events as shown in the video evidence. And Plaintiff's version of events is not supported by the video evidence.

As to the relationship between the need and amount of force used (*Kingsley* factor 1) and whether the plaintiff was actively resisting (*Kingsley* factor 6), there is no dispute that Defendants used force only after Plaintiff refused to comply with orders to be handcuffed and continued to use force because Plaintiff continued to fail to comply by physically resisting. Plaintiff's own testimony and the video footage depict that Plaintiff snatched his arm away and refused Sgt. Pedersen's order to be handcuffed once he learned that he was going to segregation. The video footage depicts that Plaintiff then ignored nearly ten separate verbal warnings to cease resisting.

8

For the next minute he physically struggled against the officers and continued to attempt to evade control and refused to relinquish his arms and hands for cuffing. As the Seventh Circuit has recognized, inmates must comply with orders because their failure to do so places correctional officers and other inmates in danger. *Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009) ("Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them.").

The severity of the security problem at issue (*Kingsley* factor 4) and the threat reasonably perceived by the Defendants (*Kingsley* factor 5) also weigh heavily in Defendants' favor. Not only was Plaintiff physically resisting, but he had also openly declared that he was both homicidal and suicidal when Defendants encountered him. He told the officers that he was prepared to kill his cellmate if he returned to his cell, and he repeatedly stated that he no longer wanted to live if he were locked up in a cell. A reasonable officer would have perceived a severe security problem and a significant threat to the officers or other inmates based on an inmate left unsecured with a pair of metal handcuffs dangling from one wrist in that frame of mind. Plaintiff had essentially indicated to Defendants his willingness to die rather than cuff up and go to segregation.

Finally, *Kingsley* factor 3 also weighs in Defendants' favor because, as Plaintiff does not dispute, the officers did not use any force whatsoever after the handcuffs were finally secured, demonstrating some effort to temper the amount of force used.

Despite all of the above, Plaintiff purports that, at least once he was on the ground, the officers had immobilized him, such that Defendants' particular uses of force at that point were unreasonable even though he was not yet handcuffed. He says that the officers "staged a struggle"

at that point in their encounter. (Dkt. 68, pg. 3.) These arguments are not compelling for several reasons.

First, a "staged struggle" is not a reasonable interpretation of the video footage. Plaintiff's body once on the ground is largely obscured by the officers above him. But the officers' reactive body movements, Plaintiff's erratic screaming, and the officers' continued verbal commands to stop resisting suggest that Plaintiff was still doing so even once on the ground. There is nothing in the footage to reasonably infer that the Plaintiff was secured and had submitted at that point and the officers nonetheless made a split-second and tacit concerted decision to continue to stage a non-existent struggle. The Court will not credit Plaintiff's untrue allegation belied by actual video evidence. *See, e.g., Johnson v. Moeller*, 269 Fed. App'x 593, 596 (7th Cir. 2008) (summary judgment upheld for defendant on excessive force claim where security-camera footage belied Plaintiff's version of events and demonstrated reasonableness of force used).

Second, even if, *for the sake of argument*, the Court credits Plaintiff that he felt immobilized once taken to the ground, he fails to appreciate that it was likely difficult for Defendants and the numerous other officers to get an accurate picture of how contained Plaintiff was at any given point. Plaintiff does not suggest that he vocalized his purported immobility or intent to comply once on the ground. The Defendants could reasonably have misperceived the movements of other officers to subdue or immobilize Plaintiff as Plaintiff attempting to continue fighting and resisting. The Defendants likewise could have reasonably misperceived Plaintiff's own natural body movements in response to efforts to maneuver him as Plaintiff attempting to continue to fight or resist. While hindsight might be 20/20, in the heat of the moment, it would have been difficult to know whether Plaintiff was contained, fighting, or submitting at any given

10

point throughout the encounter given the number of officers involved and how it unfolded. *See, e.g, Varnadore v. Merritt*, 778 F. App'x 808, 815 (11th Cir. 2019) (finding "resistance" factor tipped for officers where suspect was not actively resisting arrest when shot, but had previously refused to comply with order to show his hands); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 771 (7th Cir. 2005) ("just enough force to prevent an individual from 'squirming' or escaping might be eminently reasonable"). In the circumstances present here, it was reasonable to continue to employ force until Plaintiff was fully restrained in handcuffs.

Plaintiff points to his injury—the laceration on his eye and the bleeding from the torn dreadlocks —as evidence that the force used was excessive. (Dkt. 68, pg. 3-5.) But while the extent of the injury is relevant because it provides some indication of the amount of force applied, *see McCottrell v. White*, 933 F.3d 651, 664 (7th Cir. 2019), "injury and force are only imperfectly correlated, and it is the latter that ultimately counts," *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).

That Plaintiff was injured, while unfortunate, does not mean that the amount of force used against him was unreasonable. As Defendants argue, they could not allow Plaintiff to remain only partially cuffed in his agitated state. The injuries were the result of a struggle to subdue Plaintiff in the course of his ongoing physical recalcitrance.

The Court recognizes that the force employed by Defendants was not minimal. The videos show several closed-fist punches to Plaintiff's upper body and head and that Plaintiff was tased both while standing and on the ground. But Plaintiff had swung his arms and was actively resisting any attempt to be restrained when this force was deployed. Officers are not required to use "the least amount of force possible" to restrain an inmate. *Harris v. Ealey*, 18 C 2210, 2021 WL 5823513, at *5 (N.D. Ill. Dec. 8, 2021). Rather, the force used must be reasonable under the

circumstances. *Id.* (citing *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003)). The reasonableness of officer's conduct depends on what they are "facing at the time," including whether the inmate is "threatening violence." *Id.*

And the incident unfolded suddenly and rapidly. As many courts have observed, officers encountering a recalcitrant inmate "do not have the luxury of time, and they do not act in an adrenaline-free environment." *Id.; see Clay v. Williams*, No. 17 C 6461, 2020 WL 2836740, at *9 (N.D. Ill. May 31, 2020) ("Officers must make split-second decisions about the use of force in tense, uncertain, and rapidly evolving environments."); *see also Pryor v. Corrigan*, No. 17-cv-1968, 2022 WL 1607395, at *5 (N.D. Ill. May 20, 2022) (observing in a Fourth Amendment context that, "Police officers on the beat do not have the luxury of sitting back in one's office—with a coffee cup in hand—watching the video frame-by-frame, and parsing how someone else should have responded. Law enforcement often confront dangerous situations with their hearts pumping, blood flowing, and adrenaline racing through their veins.")

The undisputed record in this case demonstrates that Plaintiff, in an apparently suicidal state, refused to comply with Defendants' orders and that their subsequent use of force was reasonably calculated to gain compliance and avoid a security threat. As a matter of law, the level of force deployed by Defendants was objectively reasonable on these facts. *See Sallenger v. Oakes*, 473 F.3d 731, 740 (7th Cir. 2007) ("closed-fist blows and blows with the flashlight" could be necessary before, but not after, suspect was handcuffed); *Fitzgerald v. Santoro*, 707 F.3d 725, 734 (7th Cir. 2013) (affirming summary judgment for officers who grabbed detainee by arms, used an arm-bar and wrist-lock technique, and forced her onto a gurney while she screamed, tried to pull her arms away, and tried to fight the officers); *Matt v. City of Green Bay*, No. 21-C-439, 2022

WL 1063724 (E.D. Wis. April 8, 2022) (officer's hand-strike to the face was objectively reasonable because officer reasonably believed that the plaintiff posed a threat); *see also Johnson v. Rogers*, 2019 WL 203115, at *15 (S.D. Ind. Jan. 15, 2019), aff'd, 944 F.3d 966 (7th Cir. 2019) (officers were entitled to qualified immunity for repeatedly discharging a taser at a resisting individual who was combative, was ignoring repeated instructions to lie down, and did not indicate any willingness to be handcuffed).

Because Defendants are entitled to summary judgment, the Court need not address their alternative argument on qualified immunity grounds. Final judgment will be entered in favor of Defendants. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1)(A). If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court stating the issues he intends to present on appeal. *See* Fed. R. App. P. 24(a)(1).

## CONCLUSION

Defendants' motion for summary judgment [59] is granted. Plaintiff's motion for summary judgment [67] is denied. The Clerk is directed to enter final judgment for Defendants and against Plaintiff. This case is closed.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: September 5, 2025

13